Thomas J. Salerno (No. 007492)
Anthony P. Cali (No. 028261)
**STINSON LEONARD STREET LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Thomas.salerno@stinson.com
Anthony.cali@stinson.com
Proposed Attorneys for Debtor and
Debtor-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re | Chapter 11 |
| CANYON PORTAL II, LLC, | Case No. 2:15-bk-16313-EPB |
| Debtor. | **OMNIBUS DECLARATION OF AL SPECTOR IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS** |

Al Spector, under penalty of perjury, states:

1. I am the Manager of Canyon Portal II, LLC, an Arizona limited liability company (the "**Debtor**").

2. I make this the declaration on personal knowledge in my capacity as the Manager of the Debtor in connection with the Debtor's voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, filed on December 31, 2015 (the "**Petition Date**").

3. As Manager, I am familiar with the Debtor as well as the general business and financial affairs of the Debtor. The statements set forth below are true to the best of my personal knowledge and if called to testify to those statements, I would do so competently.[1]

---
[1] Some of the information contained in this Declaration was provided to me by representatives of the Debtor, which I have relied on for purposes of preparing this Declaration.

4. This Declaration is submitted in support of factual allegations contained in the following motions, filed contemporaneously with this Declaration.[2]

- "Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral"
- "Emergency Motion for Entry of Interim and Final Orders Under 11 U.S.C. § 366 Determining Adequate Assurance of Payment for Future Utility Services and Establishing Determination and Objection Procedures;"
- "Debtor's Motion for Order Authorizing Debtors to Obtain Post-Petition Financing;"
- "Motion to Approve Order Authorizing Limited Use of Cash Collateral Under 11 U.S.C. § 363;"
- "Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 345 and 363: (A) Authorizing Maintenance of Existing Bank Account; and (B) Allowing Debtor to Continue Using Existing Business Forms;" and
- "Application to Employ Stinson Leonard Street, LLP as Counsel for Debtor Canyon Portal II, LLC"

**OMNIBUS STATEMENT OF FACTS IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

5. On December 30, 2015, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), which case is pending before the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**").

6. Debtor is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona. Accordingly, venue of this Bankruptcy Case is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

[2] All capitalized terms not defined in this Declaration have the same meanings ascribed to them in the corresponding pleadings.

### Management of the Debtors

7. As noted above, I am the Manager of the Debtor. I also own 84.53% percent of the membership interests in the Debtor.

8. The remaining membership interests are held by SP Acquisitions, LLC, an Arizona limited liability company (15.47%).

### Debtor's Acquisition and Management of Its Property

9. The Debtor came into existence in about 1992 when it bought an interest in the leasehold associated with certain property located at 270 N. Highway 89A, Sedona, Arizona (the "**Property**"), which at that time had only 15 years remaining on the life of the lease. The Debtor currently owns the Property.

10. On June 30, 1998 Carla Lepori Coniglio, as Trustee of the Carla Lepori Coniglio Living Trust and personally as the wife of Philip Coniglio as to her sole and separate property, and as the agent for all other owners of the pertinent land as set forth in the Durable General Power of Attorney, recorded March 25, 2004 in the Official Records of Coconino County, Arizona as Instrument No. 2004-3254669 (collectively, the "**Original Landlord**") and Canyon Portal, LLC, an Arizona limited liability company (the "**Original Tenant**") entered into the Amended and Restated Commercial Lease, a Memorandum of which was record on July 2, 1998 in Docket 98-21399, page 361 of the Official Records of Coconino County, Arizona (the "**Ground Lease**").

11. On or about December 18, 2001, with the Landlord's approval, Original Tenant assigned its interest in the Ground Lease to the Debtor.

12. The Property contains 25 separate lease spaces and a total of 47,458 square feet, of which 26,146 is retail and 21,312 are the thirty-thee (33) hotel units leased to The Orchards Inn of Sedona.

13. The Property is 97.3% leased and occupied. The location of the Property is among the best in Sedona, occupying the middle block on Highway 89A, where most of the 3 million annual Sedona tourists visit. Accordingly, rents for the Property are high, ranging from a low of more than

3

$4.50 per square foot per month for the largest retail space of 6,870 square feet to a high of more than $28 per square foot per month for a small space of 368 square feet.

14. The Debtor is managed by Barret Realty, LLC.

15. The Debtor has invested millions of dollars in improving the Property. The building known as the Trading Post Building (consisting of 8466 square feet) was renovated and an additional 2200 square feet was added onto the building in or around 1998. The building known as the Canyon Portal Building (consisting of 5061 square feet) was renovated. Old motel units associated with the Property were torn down and the building known as the North Retail Building (consisting of 12,066 square feet) was built in or around 1999. A large basement parking lot was also built under the North Retail Building.

16. The leasehold was renegotiated in July 2013, so that there are now fifty-five (55) years remaining on the Ground Lease. The Ground lease was also recently renegotiated in October, 2015 to lower the Ground Lease payments substantially—a reduction of almost $200,000 per year in payments.

## **Debt**

17. On or about December 15, 2005, the Debtor procured a loan from J.P. Morgan Chase, N.A. (the "**Original Lender**") in the original principal amount of $21,000,000 (the "**Loan**").

18. U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association, as trustee for the registered holders of J. P. Morgan Chase Commercial Mortgage Securities Trust 2006-CIBC14, Commercial Mortgage Pass-Through Certificates, Series 2006-CIBC14 (the "**Noteholder**") is the current owner and holder of the above-referenced Mortgage Loan evidenced, secured and governed by various documents (the "**Loan Documents**") including, but not limited to (i) a Note; (ii) the certain Deed of Trust Security Agreement dated as of December 15, 2005 executed by Debtor, as trustor, in favor of Pioneer Title Agency, Inc., as trustee, for the benefit of Original Lender, as beneficiary; and (iii) that certain Assignment of Leases and Rents dated as of December 15, 2005, executed by the Debtor, as assignor, in favor of Original Lender, as assignee.

19. C-III Asset Management LLC ("**C-III**") is the special servicer for the Noteholder.

20. The Debtor believes that C-III's asserted secured claim as of the Petition Date is approximately $22,314,000.00.

21. An appraisal commissioned by the Debtor in 2015 valued the Debtor's interest in the Property at approximately $29,500,000.00.

22. The Loan Documents are by a certain Guaranty dated as of December 15, 2005, executed by Al Spector and Jack Gechman (the "**Guarantors**"). Mr. Gechman is a Canadian citizen. His whereabouts are currently unknown to the Debtor.

## **Events Leading to the Debtors' Bankruptcy Filing**

23. Starting in September 2015, the Debtor began seeking some justification or basis for the Noteholder's charge of $319,732.73 in allegedly accrued interest. The Debtor has not been able to obtain any justification from the Noteholder.

24. On November 23, 2015, the Debtor sent a proposal to the then-servicer of the Loan Documents, Berkadia Commercial Mortgage, requesting to discuss either an extension of the debt or an orderly turnover of the collateral. The Debtor requested a meeting to occur in the first week of December 2015 in order to have a constructive discussion. The request was met with silence and the Debtor subsequently learned that the Loan Documents were being transferred to yet another servicer— C-III.

25. The Loan will mature according to the terms of the Loan Documents on January 1, 2016 (the "**Maturity Date**"). The Debtor does not have sufficient funds currently to pay off the Loan balance on the Maturity Date.

26. The Debtor was hampered in its efforts to finalize refinancing efforts by virtue of being unable to obtain specific information on alleged amount due. *See* paragraphs 23 and 24, above. The foregoing notwithstanding, the Loan is not in monetary default as of the Petition Date.

## **DECLARATION IN SUPPORT OF FIRST DAY MOTIONS**

**Motion for Entry of Interim and Finals Orders Under 11 U.S.C. § 366 Determining Adequate Assurance of Payment for Future Utility Services and Establishing Determination and Objection Procedures.**

5

27. Continued and uninterrupted utility service is essential to the Debtor's ability to sustain its business operations during this Case. The Debtor is required to oversee the operations of its businesses and manage properties associated with the operation of their businesses. Any interruption of utility service would severely disrupt the Debtor's business operations, and jeopardize the Debtor's ability to preserve the value of the estate.

28. In the normal course of its business, the Debtor uses electricity, gas, and water provided by the Utilities. The Debtor's ability to effectively oversee and manage their business during the pendency of this Case is dependent on the uninterrupted provision of services by the Utilities, and the Debtor's ability to preserve the value of the estates will be irreparably damages if the Utilities do not continue to provide these services.

29. The Debtor also relies on technology (*i.e.*, computers, internet, and the like) to oversee its businesses and manage its property. Therefore, continued and uninterrupted electric service is critical to the Debtor. The Debtor is similarly dependent on the continuation of other utility services such as telephone, cellular phone, internet services, water, and gas. Indeed, maintenance of all telecommunications service is imperative because the Debtor uses telephones and cellular phones to promote and conduct their operations. As with any business operating in today's technological society, e-mail and internet services have become absolutely necessary and critical to the Debtor's operations and business. Absent these basic communication channels, the Debtor cannot effectively and efficiently communicate internally or with third parties who similarly rely on these advanced—yet common—communication channels. Furthermore, the maintenance of water and gas service is essential to provide the basic necessities of any business operation.

30. The Debtor receives utility service from Arizona Public Services ("**APS**"), the City of Sedona, Unisource Energy, Waste Management, Arizona Water, and Century Link.

31. The Debtor has historically made prompt and complete payments with respect to the Utilities before the Petition Date. As of the Petition Date, the Debtor is current with the Utilities.

32. APS currently holds a $400.00 security deposit paid by the Debtor pre-petition.

6

33. The Debtor believes that any Utility seeking a security deposit or seeking to terminate services would be doing so as an automatic reaction to a filing for relief under the Bankruptcy Code. The Debtor has, and will continue to have, sufficient funds to make timely payments to the Utilities for all post-petition utility service.

**Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral**

34. As of the Petition Date, the Debtor does not have an agreement with C-III concerning consensual use of Cash Collateral.

35. The Debtor possesses cash collateral from its leasing operations and needs to use cash collateral to pay its operating and other expenses.

36. The Debtor has no other source of operating revenue with which the pay such expenses and if such expenses are not paid the Debtor will be unable to continue its operations

37. The Debtor proposes to provide adequate protection to C-III by providing adequate protection payments to C-III in the form of monthly interest payments at the non-default rate of interest as provided for in the Loan Documents (the "**Adequate Protection Payments**"). The Adequate Protection Payments will commence on January 30, 2015 or the date which is ten days after the entry of the Interim Order, whichever is later, and will continue until confirmation of the Debtor's Chapter 11 Plan or further order of the Court.

38. In this case, C-III is also protected by the equity cushion in the Debtor's interest in the Property, as well as the maintenance of its collateral as a going concern. In this case, the Debtor's Property assets are not decreasing in value.

39. The Debtor submits that the Adequate Protection Payments set forth above are sufficient to adequately protect C-III with respect to the Debtor's use of Cash Collateral.

40. Moreover, the Debtor is also continuing and preserving the going concern value of its business during the requested time period for use of the Cash Collateral.

**Debtor's Motion for Order Authorizing Debtor to Obtain Post-Petition Financing**

41. As of the Petition Date, the Debtor has cash on hand of approximately $51,546.95.

42. The Debtor anticipates that it may not generate sufficient operating revenue to pay the anticipated administrative expenses of the estate professionals.

43. The proceeds of the DIP Facility will be used to pay the approved fees and costs (on an interim or final basis) of the Debtor's estate professionals.

44. The Debtor has determined that the DIP Facility is necessary to meet the Debtor's restructuring efforts, namely in order to pay the approved fees and costs of the Debtor's estate professionals. In this regard, the Debtor has concluded that obtaining the post-petition financing contemplated is necessary and in the best interest of the Debtor and its estate.

45. The Debtor negotiated the terms of the DIP Facility with the DIP Lender in good faith and at arms' length. The Debtor has determined that its existing financial circumstances necessitate the DIP Facility in order to meet its restructuring or liquidation needs. Accordingly, the terms of the DIP Facility are most favorable in light of the Debtor's needs pending the restructuring or liquidation procedure.

46. The DIP Facility constitutes a financing package in the best interests of the Debtor and its estate. The DIP Lender presented the Debtor with the most attractive economic package available under the circumstances.

**Emergency Motion for Interim and Final Orders Under 11 U.S.C. §§ 105(a), 345 and 363: (A) Authorizing Maintenance of Existing Bank Account; and (B) Allowing Debtor to Continue Using Existing Business Forms**

47. In the ordinary course of business, Debtor maintains one bank account to efficiently collect, transfer and disburse funds generated by the Debtor's business.

48. The Debtor's operating account (the "**Operating Account**") is maintained at Alliance Bank, N.A. ("**Alliance**"). The Debtor's principal source of cash flow is rent from the Debtor's property located at 270 N. Highway 89A, Sedona, Arizona, which contains twenty-five (25) separate lease spaces. All proceed received by the Debtor are deposited into the Operating Account. Debtor then uses the funds in the Operating Account to satisfy its accounts payable, debt service, taxes, and other

8

operating expenses. Debtor estimates that as of the Petition Date, the balance in the Operating Account was approximately $_____.

49. Debtor submits that its Operating Account is an FDIC-insured bank account.

**Application to Employ Stinson Leonard Street, LLP as Bankruptcy Counsel for Debtors**

50. The Debtor proposes to retain Stinson Leonard Street to:

   a. advise the Debtor with respect to its powers and duties as debtor-in-possession in the continued management of its business and property;

   b. attend meetings and negotiate with representatives of creditors and other parties in interest and advising and consulting on the conduct of this Chapter 11 case, including all the legal and administrative requirements of operating in Chapter 11;

   c. assist the Debtor with the preparation of its Schedules of Assets and Liabilities and Statement of Financial Affairs;

   d. advise the Debtor in connection with any contemplated sales of assets or business combinations, formulate and implement appropriate procedures with respect to the closing of any such transactions, and counsel the Debtor in connection with such transactions;

   e. advise the Debtor in connection with any post-petition financing and cash collateral arrangements and negotiating and drafting related documents, providing advice and counsel with respect to prepetition financing agreements and their possible restructuring;

   f. advise the Debtor on matters relating to the assumption, rejection, or assignment of unexpired leases and executory contracts;

   g. advise the Debtor with respect to legal issues arising in or relating to the Debtor's ordinary course of business including attendance at senior management meetings, meetings with the Debtor's financial and restructuring advisors and meetings of the board of directors;

9

h. take all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on its behalf, the defense of any actions commenced against it, negotiations concerning all litigation in which the Debtor is involved, and objecting to claims filed against the Debtor's estate;

i. prepare, on the Debtor's behalf, all motions, applications, answers, orders, reports, and papers necessary to the administration of the estate;

j. negotiate and prepare, on the Debtor's behalf, a Chapter 11 plan, related disclosure statement, and all related agreements and documents and taking any necessary action on the Debtor's behalf to obtain confirmation of that plan;

k. attend meetings with creditors and other third parties and participate in negotiations with respect to the above matters;

l. appear and advance the Debtor's interests before this Court, any appellate courts, and the US Trustee; and

m. perform all other necessary legal services and provide all other necessary legal advice to the Debtor in connection with this Chapter 11 case.

51. To the best of the Debtor's knowledge, information and belief, based on and other than as set forth in the Verified Statement, Stinson Leonard Street does not hold or represent an interest adverse to the Debtor's estate and is a "disinterested person," as that term is defined in Bankruptcy Code § 101(14) and modified by Bankruptcy Code § 1107(b), with respect to the matters for which it is to be retained. To the best of the Debtor's knowledge, information, and belief, based on and other than as stated in the Verified Statement, the partners, counsel, and associated of Stinson Leonard Street do not have any connection with the Debtor or its affiliates, its creditors, the estate, the United States Trustee or any person employed in the office of the United States Trustee for Region 14, or any other party-in-interest, or their respective attorneys and accountants.

52. To the best of the Debtor's knowledge, information, and belief, the disclosures made by Stinson Leonard Street in the Verified Statement regarding connections with the Debtor, their creditors, any other parties-in-interest in these cases satisfy the requirements of Bankruptcy Rule 2014.

10

53. The Debtor seeks to retain and employ Stinson Leonard Street on an hourly basis at rates consistent with those Stinson Leonard Street routinely charges in comparable matters.

54. The Debtor respectfully submits that its fee arrangement with Stinson Leonard Street as set forth above, is similar to fee arrangements that have been authorized in other Chapter 11 cases in which Stinson Leonard Street has rendered services, is reasonable in light of industry practice, is similar to market rates both in and out of Chapter 11 proceedings, is reasonable in light of Stinson Leonard Street's experience in reorganizations, and is reasonable in light of the scope of the work to he performed pursuant to its retention. The Debtor believes that the proposed fee structure is reasonable given the nature of the services to be provided, and that the fee structure is both fair and reasonable.

55. The Debtor believes that Stinson Leonard Street is both well qualified and uniquely able to represent them effectively and efficiently in the Cases.

[Remainder of page intentionally left blank]

11

DATED this 31st day of December, 2015.

_____
Al Spector